**Affirmed as Modified and Memorandum Opinion filed July 16, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-22-00734-CR

## ERICK ALFREDO PERALTA, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 182nd District Court
Harris County, Texas
Trial Court Cause No. 1577092**

## MEMORANDUM OPINION

In three issues appellant challenges his capital-murder conviction and resulting life sentence. In his first two issues, appellant complains the trial court erred first when it denied his motion to exclude evidence of cell phone data and again when it refused to incorporate in the jury charge the lesser-included offenses of theft and robbery. We sustain only appellant's third issue regarding court costs, which is consistent with the trial court's post-judgment, post-appeal finding that appellant lacked the ability to pay court costs. We affirm as modified, so that the

judgment reflects zero-dollar court costs.

## FACTUAL AND PROCEDURAL BACKGROUND

On the evening of Thursday, January 11, 2018, Jenny and Bao Lam went to eat at Fuddruckers with their son-in-law, Soon Kook. As they stood discussing their order, restaurant surveillance showed Jenny was wearing a red-and-beige striped sweater and blue jeans. The footage also showed that they left around 6:51 p.m. Then the three "[w]ent to a meeting together," Kook told the jury, "and after that they dropped me at my house and they went back to their house." Kook estimated that he was dropped off between 8:00 and 8:30 p.m. He did not speak to the Lams again.

That same night, Valeria Aguirre looked out her window at the Windfern Apartments and saw two young men, one Hispanic and one African American, coming down the stairs in dark clothing wearing blue gloves, "like doctors." According to Aguirre, the two men got into a black Lincoln Navigator with the Hispanic male driving and the African American male, who walked with a noticeable limp, in the passenger seat. They left in the Navigator around 8:00 or 8:30 p.m. A few hours later, she heard a lot of noise through her window and heard people gathered around a Porsche, and laughing. This prompted her to go to her window where she saw two people giving high fives, and celebrating. They were "taking out like luggage or something like black bags" and carrying them to Aguirre's neighbor's apartment downstairs, where Aakiel Kendrick lived. Aguirre said that the members of the group were the same two men she had seem earlier plus her neighbor, Kendrick.

When the Lams' son, Richard, returned from a vacation on the morning of Saturday January 13, 2018, he tried calling both of his parents, but he couldn't reach them. After multiple failed attempts to reach his parents, Richard drove to

his parents' home on Glorietta Turn. During his drive, he called his sister who confirmed that she had not heard from their parents "from like on Friday the 12th or Saturday the 13th."

Though he could not enter the home, what Richard found upon reaching the house—lights on, a garage door left "wide open", a missing Porsche, and a clear view from the windows that inside the home "a lot of items [had been] disturbed"—prompted him to call the police. Harris County Sheriff's Deputy Jordan Reinert, accompanied by another officer, Deputy Mendoza, arrived and spoke to Richard and other family members who had since arrived and observed no signs of forced entry, but like Richard, could tell after looking through several windows that "the whole house was ransacked." After Reinert was denied permission from his supervisor to force entry into the home, the family "agreed to break a window" so that the officers could enter.

As the officers passed through the broken window, they immediately found themselves in the master bedroom, where they observed "[a] big pile of blankets" at the foot of the bed and a trail of bloodstains running across the room to a nearby hallway. Bao and Jenny Lam's bodies were found underneath the blankets in the master bedroom. Both appeared to have been restrained and suffered multiple trauma: Jenny had suffered blunt force trauma and a gunshot to the back of her head and Bao had multiple gunshot wounds. Jenny was wearing the same clothes she had been wearing at Fuddruckers, and the handbag she had that night was found in the garage where the Porsche should have been parked.

Homicide detectives recovered "days and hours" of surveillance video from the gated entrance to the Lams' community which assisted in identifying the suspects and obtaining public assistance. After watching footage provided by police to the media, Aguirre called police because she believed one of the men she

had seen at her apartment was the same man she saw on the news.

On January 16, 2018, Deputy Mario Quintanilla met with Aguirre and showed her a photo array which included the suspect Aakiel Kendrick. Aguirre identified Aakiel Kendrick as the man she had seen loading "luggage or something like black bags" into his apartment. The following day, Deputy Quintanilla returned to visit with Aguirre again to show her photo arrays of Khari Kendrick and appellant, Erick Alfredo Peralta. Though Aguirre could not identify the photo of Khari Kendrick, she identified appellant as the driver of the Porsche and the Lincoln.

Video surveillance footage from both the Windfern Apartment complex and from the gated entrance to the Lam's community showed that the Lams' Porsche and a Lincoln Navigator returned to the Lam's house multiples times that night and the next day. Additionally, homicide detectives reviewed cell-tower data from appellant's, Khari Kendrick's, and Aakiel Kendrick's cell-phone providers. This data showed where the three men were located at various times consistent with video footage from the Windfern Apartments and the Lams' community gate entrance.

A few days later, appellant posted a picture to his Instagram account where he was holding one of Bao's stolen firearms. That weapon, along with many items that had belonged to the Lams, were found in Aakiel Kendrick's apartment, including the key fob to the Lams' Porsche.

On January 17, 2018, appellant was charged by indictment with the offense of capital murder. Before trial, appellant moved to have evidence obtained from a cell phone recovered by the police excluded at trial. The court denied the motion, and on October 2, 2022, after appellant pleaded not guilty, his case was tried to a Harris County jury.

Before the court delivered the jury charge, at the charge conference, appellant's counsel requested that the lesser-included offenses of theft and robbery be included in the jury charge. The court denied that request but included in the charge the lesser included offense of murder which had been agreed-to between the State and appellant's counsel. On October 11, the jury found appellant guilty of capital murder. As the State did not seek a death sentence, appellant was automatically sentenced to life in prison without the possibility of parole.

## I. DENIAL OF MOTION TO SUPPRESS

In his first issue, appellant argues that the trial court reversibly erred when it denied his motion to suppress evidence found on Khari Kendrick's cell phone which Khari allowed the police to search after he had been stopped, searched and detained. Appellant contends that the cell phone is fruit-of-the-poisonous tree, tainted by an illegal search.

Among other responsive arguments, the State raises the threshold issue of appellant's standing to challenge the complained-of search, and contends that appellant failed to demonstrate that the complained-of search was conducted without a warrant.

For a defendant to have standing to challenge a search, he must demonstrate both that he suffered an "injury in fact" and that he is "asserting his own legal rights and interests rather than basing his claim for relief upon the rights of third parties." *Rakas v. Illinois*, 439 U.S. 128, 139 (1978) (internal quotation marks omitted). Two distinct theories of search can support a defendant's claim to standing: an "intrusion upon property" theory or a "reasonable expectation of privacy" theory. *Wiltz v. State*, 595 S.W.3d 930, 934 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). However, appellant failed to demonstrate standing under either theory. First, appellant was not in Khari's car when it was pulled over, and

5

there is no evidence appellant had any possessory interest in the vehicle. No evidence was presented at the suppression hearing of appellant's possessory interest in the phone. At trial, Khari's friend, Gonzalez, testified that the phone belonged to Khari under Gonzalez's cell-phone plan with Sprint. Gonzalez explained that appellant was not associated "with the bills or the provider" for this phone. Neither at the suppression hearing nor at trial did the trial court hear evidence to contradict Gonzalez's assertions. When the officers searched Khari's phone—with Khari's consent–they could not have done so in violation of appellant's Fourth Amendment rights as the phone did not belong to him. Appellant had no constitutionally-protected property interest in Khari's phone. *See Grant v. State*, 531 S.W.3d 898, 900 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) ("The defendant carries the burden of proof to provide facts that establish standing.").

Secondly, there no evidence appellant had a subjective expectation of privacy with respect to his friend's cell phone. As the record does not include any explicit findings, this Court must "imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those implied fact findings." *Thomas v. State*, 586 S.W.3d 413, 419–20 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). The trial record supports an implied finding that appellant had no subjective expectation of privacy in the contents of his friend's phone; he therefore lacked standing to challenge the officers' search of it.

Even presuming without deciding that appellant had and has standing to challenge law enforcement's traffic stop of Khari and the subsequent search of Khari's cell phone, we consider whether appellant is entitled to relief under his first issue and as a starting point query whether he shifted the burden to the State.

Prior to trial, appellant's trial counsel argued to the court that cell-phone evidence recovered by investigators during a traffic stop of appellant's co-defendant, Khari Kendrick, should be suppressed. At the suppression hearing, appellant's trial counsel provided a written motion which included as attachments (1) a copy of a motion to suppress filed in Khari's capital-murder case; and (2) a one-page transcript dated May 19, 2022, in which the trial court denied Khari's motion to suppress.

We review a trial court's ruling on a motion to suppress under a bifurcated standard. *Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35 (Tex. Crim. App. 2017). As long as the record supports the trial court's determination of historical facts, and mixed questions of law and fact that rely on credibility, courts give almost total deference to those decisions. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). We review de novo the trial court's application of the law to the facts. *Ramirez-Tamayo*, 537 S.W.3d at 35. When, as in this case, the trial court does not make formal findings of fact, we will uphold the trial court's ruling on any theory of law applicable to the case and we will presume the trial court made implicit findings in support of its ruling if the record supports those findings. *Cheek v. State*, 543 S.W.3d 883, 888 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

When a defendant seeks to suppress evidence on the basis of a Fourth Amendment violation, this Court has placed the burden of proof initially upon the defendant. As the movant in a motion to suppress evidence, a defendant must produce evidence that defeats the presumption of proper police conduct and therefore shifts the burden of proof to the State. *State v. Martinez*, 569 S.W.3d 621, 623–24 (Tex. Crim. App. 2019). The defendant meets this burden by demonstrating that the search occurred without a warrant. *Id.* at 624.; *see also Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005).

7

No witness testified to the circumstances surrounding the traffic stop of Khari and there was no evidence in the record as to whether the search occurred with or without a warrant. In the absence of such evidence the trial court could have reasonably inferred that the search occurred with a warrant. *See Thomas v. State*, 586 S.W.3d 413, 419–20 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). Without proof that a warrantless search occurred, appellant failed to shift the burden on his motion to suppress.

Accordingly, we overrule appellant's first issue.

## II. REFUSAL TO INCLUDE LESSER-INCLUDED OFFENSE IN THE JURY CHARGE

In his second issue, appellant argues that the trial court erred when it refused to instruct the jury on lesser-included offenses of robbery and theft. The State contends that appellant's trial counsel failed to preserve his charge-error complaint. To preserve a complaint that the trial court erred by refusing to submit an instruction on a lesser-included offense, the defendant must point to the specific evidence that negates the greater offense but supports the lesser offense, unless such specific evidence is manifest. *See Williams v. State*, 662 S.W.3d 452, 462 (Tex. Crim. App. 2021); Tex. R. App. P. 33.1(a)(1).

### *The Charge Conference*

During the charge conference, the parties agreed on a lesser-included offense of murder but disagreed as to whether the jury should be instructed on the lesser-included offenses of robbery and theft. As factual support for this request, counsel argued as follows:

> The facts to support that statement is that the jury could believe that the defendant was not at the scene because he did not possess the cell phone testified to, the medical examiner's testimony that guns go off, and the mental state associated with the style and way that Jenny Lam was killed versus Bao Lam. And, lastly, the ballistics testimony that

8

there could be four to six guns which could also mean that there were four to six people which could also mean that [appellant] did not conspire with Khari or Aakiel but maybe two others.

Appellant's counsel then cited three cases in support of the proposition that robbery and theft were lesser-included offenses to the alleged offense of capital murder. Another of appellant's lawyers then made an argument related to the jury instruction on conspirator liability. He said,

On conspiracy, you know, there's no evidence that the killing of these two people was foreseeable if they had initially agreed to go in and burglarize this house and steal property from it. Mainly because there's no evidence that either of these three people that we see at the gate are armed. Even if you take into consideration that they had gloves on, which I'm not sure the evidence proved, but, okay, I can give you that.

There's -- that's only proof of a potential burglary down the road. So, if the jury believes that [appellant] was present at the burglary, there's no foreseeability for a capital murder conviction and a killing of these people because nobody was armed going in. It appears by all the evidence that all the weapons came from inside the house, inside the Lams'. So, that's our argument on the conspiracy issue and why it should not be in there.

The State responded to both arguments—the first having to do with the lesser-included offenses of robbery and theft, the second the proposed instructions regarding conspirator liability—and the trial court overruled appellant's objections, refusing to instruct the jury on the lesser-included offenses of robbery and theft, and, separately, refusing to remove the instructions regarding conspirator liability.

### *Laws Applicable to Lesser-Included Offense Preservation Analysis*

The relevant sections of the Penal Code applicable to the indictment and the court's charge were sections 19.02 ("Murder"), 19.03 ("Capital Murder"), and 7.02 ("Criminal Responsibility for Conduct of Another").

Section 19.03(a)(2) provides that a person commits capital murder if the

person commits murder as defined under Section 19.02(b)(1) and "the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery . . . ." Tex. Penal Code § 19.03(a)(2). Subsection (a)(7)(A) likewise provides that a person commits capital murder if the person commits murder as defined under Section 19.02(b)(1) and the person murders more than one person "during the same criminal transaction" *Id*. § 19.03(a)(7)(A). The offense of murder defined under Section 19.02(b)(1) is "intentionally or knowingly caus[ing] the death of an individual." *Id*. § 19.02(b)(1).

Section 7.02(a)(2) provides that a person is criminally responsible for an offense committed by the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." Tex. Penal Code § 7.02(a)(2). Subsection (b), states as follows:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.
>
> *Id.* § 7.02(b).

Under these laws, the State alleged and presented evidence to support two primary and four vicarious theories of capital murder which were ultimately encompassed in the court's charge. Under Section 19.03 of the Penal Code, the State charged appellant as a primary actor, upon its allegations and evidence that

> (1) appellant intentionally caused Bao Lam's death while in the course of committing or attempting to commit a robbery of Bao, an offense under subsection (a)(2); or
>
> (2) appellant intentionally or knowingly caused both Bao's and Jenny Lam's deaths during the same criminal transaction, an offense under

10

subsection (a)(7)(A).

In addition to these primary actor theories, the court's charge also covered four law-of-parties theories upon which appellant could be convicted of capital murder:

(1) Capital murder pursuant to Section 19.03(a)(2), by way of the law of parties under Section 7.02(a)(2);

(2) Capital murder pursuant to Section 19.03(a)(2), by way of the law of parties under Section 7.02(b);

(3) Capital murder pursuant to Section 19.03(a)(7)(A), by way of the law of parties under Section 7.02(a)(2); and

(4) Capital murder pursuant to Section 19.03(a)(7)(A), by way of the law of parties under Section 7.02(b).

Thus, to preserve error on the trial court's failure to submit the lesser-included offenses of robbery and theft, appellant was required at the charge conference to point to the specific evidence that both negated at least one of the six theories of capital murder while supporting one of the proposed theories of theft or robbery.

A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. Appropriation of property is unlawful if: (1) it is without the owner's effective consent; or (2) the property is stolen and the actor appropriates the property knowing it was stolen by another. Tex. Penal Code § 31.03 (b). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he: (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. *Id*. § 29.02.

At the charge conference it was incumbent on defense counsel to point to evidence in the record that would show (1) there was no murder; (2) the murder

11

was not committed in furtherance of a conspiracy; (3) the murder should not have been anticipated; or (4) that the Jenny and Bao murders were not committed "during the same criminal transaction." *See Solomon v. State*, 49 S.W.3d 356, 369 (Tex. Crim. App. 2001).

*Analysis*

At the charge conference, appellant's counsel made four statements which we consider to determine whether he preserved error. He first argued, "the jury could believe that [appellant] was not at the scene because he did not possess the cell phone testified to . . .." This, without out more, offered an insufficient basis for the trial judge to submit the lesser-included offenses because, if the judge were to presume the jury believed from the cell phone evidence that appellant was *not at the scene*, thus negating the appellant's involvement in the murder, the same evidence would negate his involvement in the proposed lesser included offenses of theft or robbery. By way of further explanation in his reply brief, appellant contends that "a rational juror could disbelieve the phone records while still believing the other testimony that appellant possessed a stolen car." For purposes of preservation we need not address whether this further explanation would have been sufficient to preserve error, but acknowledge this explanation was not provided to the trial judge, nor was it implied or manifestly obvious from the record.

Appellant's counsel also pointed to ". . . the medical examiner's testimony that guns go off . . .," without further elaboration. This statement alone was insufficient to apprise the court of a valid basis to support submitting the lesser-included offenses. We further disagree, to the extent he suggests in his reply brief, that this testimony and subsequent questions posed to the medical examiner about the scope of her expertise were relevant to provide "reasonable doubt about who

12

used the weapon or under what circumstances it was fired."

Appellant's trial counsel's third statement referred to a distinction in the evidence about, ". . . the mental state associated with the style and way that Jenny Lam was killed versus Bao Lam." The sole suggestion that two different motives or mental states may have resulted in two different murders does nothing to indicate appellant only committed robbery or theft and not murder.

Appellant's trial counsel finally argued that "the ballistics testimony that there could be four to six guns which could also mean that there were four to six people which could also mean that [appellant] did not conspire with Khari or Aakiel but maybe two others." At best, this argument was incomplete and thus failed to preserve error; on appeal, as appellant has sought to explain his counsel's explanation further, the argument falls flat. We agree with the State that appellant proceeds from a flawed assumption that the 'number of weapons' equals 'number of participants to a crime'—this argument does not support a rational finding that appellant is guilty of robbery or theft but not capital murder.

There is no dispute that Jenny and Bao Lam were shot and killed. The combined cumulative force of the cell site data, the cell phone messages, all surveillance footage, forensic testimony of DNA evidence and bleach residue, and Aguirre's testimony implicated appellant and the Kendrick brothers in a conspiracy to commit murder in the course of a robbery, and that the Lams were murdered after returning home on the night of January 11, 2018. The mere fact that none of the guns used to shoot the Lams were recovered does not diminish the evidence of the gunshot wounds or incriminating timing of appellant's and the Kendrick brothers' appearance at the Lam's home (the day before, the night of, and the days after the Lams' murder). Appellant's counsel failed to direct the court (nor was there manifest evidence) that the Lams' murder was not anticipated, that anyone

13

other than appellant or one of the Kendrick brothers killed the Lams, and there was no evidence that either of the two were killed by accident, or to dispute that Jenny and Bao's murders were not committed "during the same criminal transaction." *See Solomon v. State*, 49 S.W.3d at 369; *see also George v. State*, No. 05-18-00941-CR, 2019 WL 5781917, at *6 (Tex. App.—Dallas Nov. 6, 2019), aff'd, 634 S.W.3d 929 (Tex. Crim. App. 2021) (mem. op.) (not designated for publication). Because appellant's counsel failed to direct the court to any supportive evidence that negated the capital murder offense but instead support the lesser offense of robbery or theft, he failed to preserve his complaint on appeal. *See Williams v. State*, 662 S.W.3d at 462.

### III. COURT COSTS

In his third issue, appellant asserted that the trial court "improperly calculated" his court costs. Appellant was charged $290 in court costs when he was sentenced, yet at the time he filed his appellate brief the trial court had not yet determined whether appellant had the resources to pay. *See Wiggins v. State*, 622 S.W.3d 556, 561 (Tex. App.— Houston [14th Dist.] 2021, pet. ref'd)( "[D]uring or immediately after imposing a sentence in a case . . . , a court shall inquire whether the defendant has sufficient resources or income to immediately pay all or part of the fine and costs.") We abated this appeal for the trial court to make a determination and the trial court concluded that appellant did not have the ability to pay any court costs. Accordingly, it only remains for this Court to modify the judgment to reflect the true court costs in this case—zero dollars.

## CONCLUSION

The trial court's judgment and sentence should be modified to reflect the trial court's interim determination of appellant's inability to pay and otherwise affirmed.

/s/    Randy Wilson
Justice

Panel consists of Justices Hassan, Poissant, and Wilson.

Do not publish — TEX. R. APP. P. 47.2(b).